Filed 1/14/21  In re P.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re P.C., a Person Coming Under the Juvenile Court Law. | B303914 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>P.C.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. FJ54670) |

APPEAL from an order of the Superior Court of Los Angeles County, Benjamin R. Campos, Judge Pro Tempore. Affirmed with directions.

Gerald Peters, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Stacy S. Schwartz and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Minor P.C. appeals from the juvenile court's order committing him to the Department of Youth and Community Restoration (DYCR), formerly known as the Department of Corrections and Rehabilitation, Division of Juvenile Justice. He contends that the juvenile court abused its discretion in committing him to DYCR. We disagree with that contention, but we modify the order to reflect the correct maximum term of confinement.

## BACKGROUND

I.    The petitions

In 2017, when P.C. was 13 years old, a Welfare and Institutions Code section 602 petition was filed alleging he had a weapon (a locking blade knife) on school grounds (Pen. Code, § 626.01, subd. (a)(1)). P.C. admitted the allegations. The juvenile court sustained the allegations and ordered a camp-community placement for a five-to-seven month term. Also in 2017, P.C. had two arrests for battery.

In July 2019, when P.C. was 15 years old, a second petition was filed alleging he committed vandalism causing over $400 in damage (Pen. Code, § 594, subd. (a)). Just one month later, a third petition was filed in August 2019 alleging that P.C. committed assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count 1), two counts of attempted second degree robbery against two victims (Pen. Code, §§ 664, 211; counts 2 & 3), and battery (Pen. Code, § 242; count 4). As to count 1, the petition alleged P.C. inflicted great

2

bodily injury on one victim (Pen. Code, § 12022.7, subd. (a)). A gang enhancement (Pen. Code, § 186.22, subd. (b)(1)(C)) was alleged as to all counts except count 4. P.C. admitted the allegations in the July and August 2019 petitions, and the juvenile court sustained the petitions.

With respect to the August 2019 petition, a probation report indicated that P.C. and a companion demanded money from two men and assaulted them. P.C. struck the first victim in the face repeatedly with a belt and punched and kicked him, even as the victim begged P.C. to stop. When P.C.'s companion hit the second victim, P.C. also struck the second victim with a belt, stomped on his face, and spat on him. The second victim later reported sustaining numerous injuries and suffering trauma. P.C. admitted using marijuana and belonging to a gang.

Mother reported that P.C.'s father abused her and P.C. P.C. struggled in school, was quick to anger, and became upset when mother tried to enforce household rules. Mother could not control him. P.C. stayed out after his curfew and did not attend school. He made poor choices in friends and was in a gang, so mother thought he would benefit from a break in his environment and negative peer group.

Also per the probation report, P.C. had the benefit of court and probation intervention with services that included suitable placement twice, but P.C. went AWOL both times. After being released from camp, P.C. was arrested four times and released on a community detention program. He remained home on probation from January 20, 2019 to the present. The probation department recommended long term camp community placement.

II.    Disposition hearing

At the contested hearing on the petition,[1] P.C.'s probation officer testified that P.C.'s performance on probation for the one year the officer had been supervising him was "[p]retty poor." P.C. had been AWOL four times. Still, P.C.'s behavior at camp had been good enough to earn him a kitchen job. He also completed mandated community service, counseling, therapy, and schooling. P.C. treated the probation officer respectfully. Since being detained in August 2019 in juvenile hall, P.C. had been following the program with no behavioral issues. The probation officer recommended long-term camp based on P.C.'s age, that it was the least restrictive punishment, and to give P.C. a second chance. He felt that P.C. needed anger management and counseling and that camp had everything P.C. needed.

However, the probation officer was unfamiliar with DYCR. He had not read a 30-day camp progress report stating that P.C. had been involved in five incidents at school ranging from failure to follow instructions, inappropriate language, classroom disruption, peer agitation, and constantly getting out of his seat without permission. The 120-day report did not include "good grams," which refers to doing things positive in nature. Still, P.C. had admitted to poor decision making, apologized to his mother, and earned verbal praise for participating in programs.

A forensic and clinical psychologist evaluated P.C. She testified that P.C.'s father abused mother and P.C. P.C. did well in school until the seventh grade, when he stopped going consistently. P.C. tested normal for intelligence, except his

---

[1] P.C. was now 16 and a half years old.

4

verbal reasoning was in the fourth percentile, meaning of 100 adolescents his age, 96 of them would understand and process information more rapidly and be able to respond. Hence, the doctor recommended further testing and an individualized education plan, which he had been receiving since January 2020. She further diagnosed him with Bipolar I disorder and attention deficit hyperactivity disorder, both of which require psychiatric treatment and psychotherapy.[2] She felt that his needs could be provided at camp or therapeutic placement as opposed to DYCR, with which she was somewhat or superficially familiar.

A social worker's report was in evidence. She also recommended placing P.C. in a structured, therapeutic environment.

III.    The juvenile court's order

The juvenile court committed P.C. to DYCR and declared all counts in the July and August 2019 petitions to be felonies except count 4 in the August petition. The juvenile court set the maximum term of confinement at two years.

The juvenile court explained its decision in detail. It agreed that although trauma explained P.C.'s behavior, trauma did not excuse his behavior. The way P.C. beat the victims with a belt was similar to how a parent beats a child, and therefore this was learned behavior. The impulsivity the doctor discussed did not explain all of P.C.'s behavior. To the juvenile court, his behavior was callous and demonstrated a lack of empathy and proper socialization. P.C. needed to internalize any changes.

---

[2] The doctor's written report, which largely mirrored her testimony, was also in evidence.

As for the probation officer's testimony, the juvenile court found him unprepared and his knowledge of the case file sorely lacking. "All he did was parrot the probation dogma," failing to mention P.C.'s heavy entrenchment in a gang. Indeed, the juvenile court noted that P.C. had a lot more "artwork" since the first time he was before the court.

The juvenile court found placement inappropriate because two placements had already been tried. And although P.C. had completed camp, he picked up the latest offenses when he got out, and the arc of his behavior was increasingly violent.

Finally, the juvenile court said it had repeatedly read the following paragraph from the declaration of a DYCR parole agent and community court liaison: DYCR provides "academic and vocational education, medical care, and treatment programs that address violent, criminogenic, and sex offender behavior as well as substance abuse and mental health needs while maintaining a safe and secure environment conducive to learning. The Integrated Behavior Treatment Model constitutes the framework for [DYCR]'s programs [and] is designed to address anti-criminal attitudes by providing youth with personal skills to better manage their environment and decrease future criminal behavior." Individualized treatment programs are created for each minor. DYCR provides a reentry program for minors with the purpose of ensuring that youth leave "with a viable plan that connects them to the resources and opportunities in the community that help them reduce the risk to reoffend and to pursue positive life goals."

The juvenile court said it was aware of DYCR's failings, but there were also problems with probation and at "Sylmar." On balance, DYCR would provide the long-term effective treatment

for P.C.'s educational, psychological, psychiatric, vocational, and other needs.

## DISCUSSION

I.      The juvenile court did not abuse its discretion

Minor contends that the juvenile court abused its discretion by committing him to DYCR.  We disagree.

We review a juvenile court's commitment decision for abuse of discretion, although we review its findings for substantial evidence.  (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5.)  A juvenile court abuses its discretion if the evidence does not support factual findings critical to its decision.  (*Ibid.*)  In making this determination, we examine the record in light of the purpose of juvenile court law.  (*Ibid.*)  That purpose is "the protection and safety of the public and each minor" and "to preserve and strengthen the minor's family ties whenever possible."  (Welf. & Inst. Code, § 202, subd. (a).)  Minors in delinquency proceedings shall receive care, treatment, and guidance that is consistent with their best interest, holds them accountable for their behavior, and is appropriate for their circumstances.  (Welf. & Inst. Code, § 202, subd. (b).)  This may include punishment that is consistent with rehabilitative objectives.  (Welf. & Inst. Code, § 202, subd. (b).)  Rehabilitation remains a primary objective, and therefore the statutory scheme contemplates progressively more restrictive dispositions, beginning with home placement under supervision, to foster home placement, to placement in a local treatment facility, and finally placement at DYCR.  (*In re Calvin S.* (2016) 5 Cal.App.5th 522, 528.)  Although DYCR commitment generally is a last resort, there is no absolute rule that less restrictive placements first must be tried.  (*In re*

7

*Carlos J.*, at p. 6.) Where DYCR commitment has been ordered, there must be evidence that less restrictive alternatives would be ineffective or inappropriate and that a probable benefit to the minor will accrue from the commitment. (Welf. & Inst. Code, § 734; Cal. Rules of Court, rule 5.790(h); *In re Carlos J.*, at p. 6.)

P.C. argues that the juvenile court abused its discretion by committing him to DYCR based solely on its assessment he was irredeemable. The juvenile court, however, never made such an assessment. In the context of pointing out that P.C. did well in camp but reverted to criminal behavior when released, the juvenile court said that P.C. needed to internalize change, that real change was not a "suit you put on and take off. It's a change you have to make from inside. *I say this as a fatally defective human being.* Change is hard." (Italics added.) The juvenile court thus did not say that P.C. was fatally defective. The juvenile court judge instead observed that the judge himself, like most, was defective in some way. The juvenile court went on to express a general belief in the "redemptive power of human beings" and a specific belief *in* P.C., that he could be a different person when he finished at DYCR, but the choice was his. Far from deeming P.C. irredeemable, the juvenile court spoke from a place of empathy and commiseration to express a belief that P.C. could change.

The juvenile court otherwise did state reasons, grounded in the evidence, for its order. To the extent dispositions should generally progress from the least to the most restrictive (*In re Carlos J.*, *supra*, 22 Cal.App.5th at pp. 5–6), that is what happened here. The juvenile court found placement to be inappropriate because P.C. had two suitable placements and one camp placement. All had failed. While P.C. made some progress

8

in placements and at camp, that progress was not long lasting. In February 2017, he committed the weapon-possession offense that was the basis for the first petition. Within a month of his arrest for that offense, he was arrested for battery, and, just two weeks later, he was arrested for a second battery. Then, when he was 15 years old, he was arrested for tagging gang graffiti at a school, the behavior that gave rise to the second petition. Just two months later, he was arrested for the assaults that gave rise to the third petition. Thus, P.C. kept reoffending despite his placements and camp.

Also, P.C.'s performance in his placements, at camp, and on probation was mixed. While he had some success, he went AWOL multiple times from probation, which was why even his probation officer could not recommend a less restrictive alternative like suitable placement. At camp, P.C. was involved in five incidents and he never earned good grams, evidence that directly supports the juvenile court's finding that P.C. never internalized what he learned at camp.

Most troubling, his behavior was becoming increasingly violent despite having received treatment. This implicates the other objective of the juvenile law, public safety. The juvenile court thus cited the viciousness and callousness of the assaults as a reason to commit P.C. to DYCR. Beyond resulting from impulsivity, those attacks showed a lack of empathy, improper socialization, and learned behavior. The juvenile court therefore believed that P.C. needed and would benefit from a longer term of confinement at DYCR. (See, e.g., *In re N.C.* (2019) 39 Cal.App.5th 81, 88–89 [minor would benefit from longer DYCR-commitment as opposed to shorter programs].)

P.C. responds that his probation officer, a social worker, and doctor advised against DYCR commitment and in favor of placement in a therapeutic setting like camp. The juvenile court, however, harshly criticized the probation officer's testimony, finding it lacking because he was unfamiliar with key parts of P.C.'s record, for example, his entrenchment in a gang. Indeed, the probation officer acknowledged that P.C. should not be in a residential treatment program because P.C. would likely abscond. Important to the juvenile court's analysis was that neither the probation officer nor the doctor was familiar with DYCR. They therefore could not speak to whether DYCR could provide P.C. with the services they were recommending. In short, the juvenile court found at least the probation officer not credible. We may not reweigh that determination. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

As for the doctor's testimony, the juvenile court agreed with her that P.C.'s behavior resulted from trauma and that he was impulsive. But that was not an excuse for his behavior, and the juvenile court referred to P.C.'s lack of restraint and that his violence was a learned behavior. This is why the juvenile court noted that P.C. had failed to internalize the changes he exhibited at his prior placements.

P.C. also faults the juvenile court for relying on the declaration of a parole agent employed by DYCR who was familiar with its treatment-needs assessment process and programming, treatment, and interventions. The agent said that DYCR provides the types of services P.C.'s probation officer and the doctor said he needs, including mental health care and academic education. After being assessed at intake, an individualized treatment plan is created for each minor. Further,

a list of DYCR programs, including educational programs, was attached to the declaration. That document states that special education students will receive designated instructional services "as required through their IEP."

P.C. discounts this evidence because no evidence was produced about DYCR's "actual practices" and calls the juvenile court's statement that P.C. can receive adequate care there "wishful thinking." The document, however, is evidence of DYCR's actual practices. This evidence also contrasts with the absence of evidence in *In re Carlos J.*, *supra*, 22 Cal.App.5th 1. In that case, the minor required intensive treatment to address, for example, his posttraumatic distress syndrome, but there was no evidence of programs at the Division of Juvenile Facilities expected to benefit him. (*Id.* at pp. 10–11.)

Also, to the extent P.C. contends that the juvenile court did not address his individualized education program, the juvenile court said it would ensure "that goes along with his package."

II. Maximum term of commitment

The juvenile court orally imposed a maximum term of confinement of two years, but the January 23, 2020 minute order of the disposition incorrectly stated the term as 21 years 2 months. The People concede, and we agree, that the term of confinement was two years. The minute order must accordingly be corrected.

## DISPOSITION

The juvenile court is directed to correct the January 23, 2020 minute order to reflect that the maximum term of confinement is two years.  The disposition order is affirmed.

NOT TO BE PUBLISHED.


DHANIDINA, J.


We concur:



LAVIN, Acting P. J.



EGERTON, J.